IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TYREE LAWSON | : | CIVIL ACTION |
| | : | |
| v. | : | No. 22-1193 |
| | : | |
| SCI PHOENIX'S GINA CLARK, et al. | : | |

**MEMORANDUM**

**Chief Judge Juan R. Sánchez**                                                    **October 12, 2023**

In January 2022, pro se Plaintiff Tyree Lawson brought this § 1983 action against four SCI Phoenix employees for alleged violations of his First and Eighth Amendment rights. After removal from state court, this Court granted Defendants' first motion to dismiss on February 15, 2023. Lawson filed a Second Amended Complaint on May 11, 2023. Defendants now move to dismiss all claims a second time, and the motion is ripe for review. Because Lawson has not pled any new factual allegations which change the Court's prior conclusions, the motion to dismiss will be granted and Lawson's claims will be dismissed with prejudice.

**BACKGROUND**

Defendants Pamela Sellers, Mandy Sipple, Gina Clark, and Suzette Keys are SCI Phoenix employees.[1] Pl.'s Second Am. Compl. ¶¶ 2-5, ECF No. 23. Lawson brings claims for two discrete matters during his incarceration: his roommate assignment from January to November 2020, and a dental appointment on March 17, 2020.

On December 9, 2019, Lawson filed a lawsuit in state court against Clark and two other prison officials who are not defendants in this case. *Id.* ¶ 6. On December 23, one of the other two defendants was served. *Id.* ¶ 8. (Lawson does not state when Clark was served.) On December 28,

---

[1] Although it is not stated in the Second Amended Complaint, the Court assumes Lawson sues each employee in their individual capacity. *See* Am. Compl. ¶¶ 2-5, ECF No. 1-11.

Sellers granted Lawson's request to switch from a top bunk to a bottom bunk. *Id.* ¶ 9. Twelve days later, Sellers moved Lawson back to the top bunk and assigned another inmate, Davis, to the bottom bunk. [2] *Id.* ¶ 11. Davis had previously been in a top bunk, and there were numerous cells with other inmates who did not have "bottom bunk status." *Id.* ¶¶ 11, 14.  Prior to Lawson, Davis had three or four cellmates over a five-month period due to his loud snoring. *Id.* ¶ 10.

On January 16, 2020, Lawson wrote to Sellers and requested a cell reassignment. *Id.* ¶ 16. Lawson wrote that Davis' "snoring was unbearable and was literally depriving Plaintiff from getting any sleep." *Id.* On January 20, Lawson informed Clark of the situation. *Id.* ¶ 18. She told him to "give the cell assignment some time." *Id.* ¶ 19. Lawson also followed up on his request with Sellers, who told him Clark was now handling cell assignments. *Id.* ¶ 20. Clark ignored several more requests from Lawson over the following days, and he filed an official inmate grievance. *Id.* ¶ 21. On February 3, he filed yet another. *Id.* ¶ 22. And from June to November 26, 2020, Lawson "sent countless written requests" to Clark requesting a cell transfer. *Id.* ¶ 25. Clark did not respond to any of these requests even though the Department of Corrections' ("DOC") policy required a response within five working days. [3] *Id.* ¶ 28. During this time, "more than 40 cells bottom bunks became available," but Davis was not reassigned to any of them. *Id.* ¶ 40. Lawson and Davis remained cellmates until November 26, 2020, when Davis had a high temperature and was transferred to a quarantine unit. *Id.* ¶ 39.

---

[2] Lawson claims "the Department of Corrections does not allow bottom bunk status persons to be reassigned to top bunks, nor top triers [sic] bottom bunks." Pl.'s Second Am. Compl. ¶ 13, ECF No. 23. But Lawson also states Davis was reassigned from a bottom bunk to a top bunk before getting assigned to Lawson's cell, and Lawson himself was initially reassigned from the top bunk to the bottom bunk. *Id.* ¶¶ 7, 9, 10. Given the apparent contradiction between these statements, the Court cannot credit Lawson's account of the DOC's bunk assignment policy.

[3] Lawson also notes the DOC's Employee Code of Ethics requires employees to "subscribe to the principle that something positive can be done for each inmate. [Which] principle is to be applied without exception (sic)." *Id.* ¶ 30.

Unrelated to Lawson's bunk and cellmate assignments, Sipple scheduled a dental examination on March 2, 2020, several months after Lawson's annual dental checkup. *Id.* ¶ 45. The examination revealed a cavity in Lawson's upper rear wisdom tooth, and Sipple scheduled a tooth extraction for March 10. *Id.* ¶¶ 46, 49. At that point, CNN had already declared COVID-19 a global health emergency in January, and "Corona Virus was declared deadly an[d] extremely contagious." *Id.* ¶¶ 43-44. On March 10, Pennsylvania implemented social distancing and the DOC suspended medical co-pays for "flu-like symptoms" such as fevers, coughs, and shortness of breath. *Id.* ¶¶ 47-48. Lawson's extraction went forward as scheduled. *Id.* ¶¶ 49-50. Sipple scheduled an initial follow up appointment for March 12, and a second follow up appointment for March 17. *Id.* ¶¶ 50, 52.

On March 17, the DOC suspended all non-emergency dental and medical visits. *Id.* ¶ 51. Lawson was unaware of the suspension and went to his appointment. *Id.* ¶ 54. When he arrived, 25 to 35 inmates were waiting to see the doctor for "flu-like symptoms." *Id.* ¶ 55. Lawson estimates the waiting room's size was 25 by 18 feet. *Id.*  Defendant Suzette Keys was at the front desk in the waiting room, blocked off by a concrete wall and glass partition. *Id.* ¶ 56. The two-inch slot that prisoners normally passed their cards through was sealed. *Id.* ¶ 57. After holding his ID card and dental pass up to the glass partition for Keys, Lawson waited for 20 to 25 minutes. *Id.* ¶ 60. When Keys sent him back, staff asked what took him so long and said they had been waiting for him. *Id.* ¶¶ 60-61. Several days later, an inmate from the waiting room was diagnosed with COVID-19, and one week later SCI Phoenix was placed on administrative lockdown. *Id.* ¶¶ 62, 63. Within a week, Lawson was "suffering burning like fluid filling my/plaintiff's [sic] lungs and fevered sweats." *Id.* ¶ 64.

**STANDARD OF REVIEW**

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly,* 550 U.S. at 556). In evaluating a Rule 12(b)(6) motion, a district court must separate the legal and factual matter elements of the plaintiff's claims. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court must then "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id*. at 211 (quoting *Ashcroft*, 556 U.S. at 679).

Additionally, courts must construe pro se filings liberally. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003). A pro se complaint must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears beyond a doubt the plaintiff cannot prove a set of facts which would entitle him to relief. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

**DISCUSSION**

Lawson brings two claims under the Eighth Amendment and a First Amendment retaliation claim. Although the Second Amended Complaint clarifies some of the factual allegations and timing of events in this case, it does not plead any new facts which compel a different conclusion on any claim. Notwithstanding Lawson's arguments against dismissal, the motion to dismiss will be granted in full.

In Count I, Lawson claims Sellers and Clark violated the Eighth Amendment by placing him in a cell with a snoring cellmate for 11 ½ months, subjecting him to sleep deprivation. The Amendment's ban on cruel and unusual punishment requires prison officials "to provide humane conditions of confinement." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 256 (3d Cir. 2010) (internal quotation marks and citation omitted). A prisoner who challenges his conditions of confinement must show objective and subjective elements in a two-prong test. *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007). First, "the deprivation must be 'objectively, sufficiently serious.'" *Porter v. Pa. Dept. of Corrections*, 974 F.3d 431, 441 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Second, "the prison official must have been 'deliberate[ly] indifferen[t] to inmate health or safety.'" *Id.* The Court previously held a snoring cellmate is not an objectively serious deprivation of life's minimum necessities. *See* Mem. 6, Feb. 15, 2023, ECF No. 10. In response, Lawson now emphasizes he was deprived of sleep for a long period of time, and his complaints were ignored. *See* Mem. Law Supp. Pl.'s Opp'n Mot. Dismiss (hereinafter "Mem. Law Supp. Pl.'s Opp'n") 3, 5, ECF No. 33.

Lawson correctly states sufficient sleep is one of "life's necessities," but the facts of his case are different from cases in which sleep deprivation was cruel and unusual punishment under the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). For example, the Third Circuit has held a prisoner sufficiently alleged an Eighth Amendment violation where he was kept in a room with a bright light on for 24 hours a day, no bedding, "paper like" clothing, and a low temperature. *Mammana v. Fed. Bureau Prisons*, 934 F. 3d 368, 371 (3d Cir. 2019). Taken together, these conditions were "mutually enforcing" such that the appellant was deprived of sufficient sleep. *Id.* at 374. Similarly, the Third Circuit held a prisoner pled an Eighth Amendment claim where numerous conditions prevented him from sleeping, including banging noise from special

needs inmates and unsanitary conditions due to a pest infestation and the smells of urine and excrement. *See Allah v. Bartkowski*, 574 F. App'x 135, 138-39 (3d Cir. 2014).

The conditions in both *Mammana* and *Allah* are distinguishable because those cases presented numerous, mutually enforcing conditions caused by the action or inaction of prison officials. *See* 934 F.3d at 371; 547 F. App'x at 138. The only basis for Lawson's claim is a snoring cellmate, and prison officials cannot control an inmate's snoring. There are no other facts alleged to support an Eighth Amendment claim for sleep deprivation. Thus, although the Court acknowledges a snoring cellmate can certainly be bothersome, it does not rise to the level of objective, sufficient seriousness necessary to state an Eighth Amendment claim.

Next, the Court addresses Lawson's retaliation claim based on the same facts. To state a retaliation claim:

> a plaintiff must demonstrate that (1) he engaged in a constitutionally protected activity; (2) he suffered . . . adverse action 'sufficient to deter a person of ordinary firmness from exercising his [constitutional rights]; and (3) that the protected activity was a substantial motivating factor in the . . . decision to take adverse action.

*Whitney v. Wetzel*, 649 F. App'x 123, 126 (3d Cir. 2016) (internal quotation marks and citation omitted). The Court previously held Lawson engaged in a protected activity when he filed a lawsuit against prison officials, but he had not linked Sellers' or Clarks' actions to the litigation. Mem. 8, Feb. 15, 2023, ECF No. 10. He has failed to do so again.

To show causation for a retaliation claim, a plaintiff "must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Whitney*, 649 F. App'x at 126. Temporal proximity is measured from the date on which a plaintiff files a complaint. *Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014) (citations omitted). And "a

temporal proximity greater than ten days requires supplementary evidence of retaliatory motive." *Id.* Lawson filed a lawsuit on December 9, 2019. Pl.'s Second Am. Compl. ¶ 6, ECF No. 23. The alleged retaliatory actions – reassignment to a top bunk, and the snoring cellmate – occurred on or about January 9, 2020, a month later.[4] There is thus no suggestive temporal proximity between Lawson filing suit and Sellers changing his bunk and cellmate assignments.[5] Nor is there any factual allegation to link the lawsuit to Sellers, who was not a defendant to the suit.

As to a pattern of antagonism coupled with timing, Lawson notes Clark ignored numerous grievances and failed to reassign him for months, even though Davis had previously been reassigned when his cellmates complained and there were open bunks in other cells.[6] *Id.* ¶¶ 10, 14, 21-22, 25, 40. But other facts in the Second Amended Complaint belie an inference of antagonism. Clark was not in charge of cell assignments when Davis was transferred to Lawson's cell. And the initial failure to reassign either inmate is consistent with Lawson's statement that Davis had three to four roommates over a five-month period. *Id.* ¶ 10. In other words, Davis' previous cellmates also had to give the assignment a chance before staff reassigned them. And approximately two months later, COVID-19 began impacting the prison's operations. SCI Phoenix was in administrative lockdown by the end of March 2020. *Id.* ¶ 63. Within the context of COVID-19's lockdowns and quarantines, and without additional evidence of antagonism by Clark, Lawson has once again failed to show a causal link between (a) his lawsuit and (b) his bunk and roommate

---

[4] Sellers granted Lawson's request to switch to a bottom bunk on December 28, 2019, and moved him back to the top bunk twelve days later. Pl.'s Second Am. Compl. ¶¶ 9-11, ECF No. 23.

[5] Lawson's argument that suggestive temporal proximity is present because he was "vigorously defending against defendants' countering *defenses*," is simply not the correct standard. Mem. Law Supp. Pl.'s Opp'n 16, ECF No. 33.

[6] He also argues for the first time that the subject of his second claim, the dental appointment, is evidence of antagonism. *Id.* But that claim involves a different set of defendants from both the lawsuit filed in December 2019 and from his first claim in this case.

assignments.[7] *See, e.g.*, *Muata v. Hicks*, No. 21-3210, 2022 WL 2526692, at *1 (3d Cir. July 7, 2022) (describing risk mitigation measures at SCI Phoenix, which included "removing ill inmates from the general population . . . . limiting inmates' movements, confining inmates to their housing units, and housing dining workers in single cells."). Because there are no new factual allegations leading to an inference of retaliation, the motion to dismiss this claim will also be granted.

In Count II, Lawson claims Sipple and Keys violated the Eighth Amendment by scheduling a dental appointment at the beginning of COVID-19, and by exposing him to other sick prisoners while he waited for that appointment. The Court previously held Lawson failed to show Sipple and Keys knew he faced a substantial risk of harm because the dental appointment was too early in the pandemic. Once again, the Second Amended Complaint does not allege any new facts which call for a different conclusion. But, as with the two claims in Count I, the Court will briefly address some of Lawson's arguments.

In responding to the motion to dismiss, Lawson adds details about the development of COVID-19 in March 2020, such as Pennsylvania Governor Tom Wolf's Proclamation of Disaster Emergency on March 6. Mem. Law Supp. Pl.'s Opp'n 11, ECF No. 33. Lawson also emphasizes that by scheduling the second follow up appointment and having him wait with other prisoners, Sipple and Keys "consciously ignored *safe-distancing* protocol, and further ignored SCI Phoenix's Institutional 3/17/2020 order suspending all 'non-essential and non-urgent dental care.'" *Id.* at 12 (lightly edited). And he states he was the only non-emergency dental checkup scheduled that day. *Id.* at 13. Taking Lawson's factual allegations as true, they do not change the Court's conclusion.

---

[7] Lawson also references an employee handbook and argues Sellers and Clerk did not follow "their employed orders—that [required them to deem] something positive can be done for every inmate." Mem. Law Supp. Pl.'s Opp'n 16, ECF No. 33. But an employee handbook does not create legal rights.

Even if Sipple and Keys ignored the policies in effect, as the Court explained previously, it was so early in March 2020 that COVID-19's severity was not yet apparent. *See* Mem. 9, Feb. 15, 2023, ECF No. 10. And the DOC was not required to eliminate *all* risk of COVID-19 exposure. *See Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 330 (3d Cir. 2020). Defendants' motion to dismiss will also be granted as to this claim.

**CONCLUSION**

As explained above, Defendants' second motion to dismiss will be granted in full. The Court also finds further amendment would be futile, as Lawson was granted leave to amend and did not allege any new facts which change the Court's earlier conclusions. Therefore, the motion to dismiss the Second Amended Complaint will be granted with prejudice, and this case will be dismissed.

An appropriate Order follows.

BY THE COURT:

_/s/ Juan R. Sánchez_
Juan R. Sánchez, C.J.